CELLULOID MANUF'G CO. *v.* CELLONITE MANUF'G CO.

*(Circuit Court, D. New Jersey. July 12, 1887.)*

1. TRADE-MARK—NEWLY-COINED WORD.
   The plaintiff was incorporated in 1871, by the name of the "Celluloid Manufacturing Company," and from that time used its corporate name in the manufacture and sale of various compounds of pyroxyline, which it designated as "celluloid," to distinguish it from similar compounds made by others. The word "celluloid" was originally coined and used to a limited extent by certain individuals who assigned their interests in the same to the plaintiff, when incorporated, and the plaintiff from that time stamped said word on the articles manufactured by it, and registered the word in the patent-office in 1873, and again in 1883. The defendant was incorporated in 1886, by the name of the "Cellonite Manufacturing Company," the corporators having been previously associated under a different name. and prepared to manufacture and sell compounds of pyroxyline under the name of "cellonite," stamped with said word; which compounds they had previously designated as "pasbosene," and by other names. The plaintiff thereupon filed its bill to restrain infringement of its trade-mark. *Held*, that the similarity was sufficient, under the circumstances, to mislead an ordinarily unsuspecting purchaser, and that the plaintiff was entitled to the relief sought.

2. SAME—CORPORATIONS.
   In dealing with corporations, an unlawful imitation of a name is subject to the same rules of law which apply where the parties are unincorporated firms or companies.

3. SAME—ABANDONMENT.
   Where a word is coined and used as a trade-mark, and stamped on articles manufactured from a certain substance, the fact that such word subsequently

becomes the common appellative of such substance cannot impair the rights acquired in the word, and while others can use it to designate the product, they cannot apply it in any way as a trade-mark.

4. SAME.

The existence of companies doing business under the names of the "Celluloid Brush Company," the "Celluloid Collar & Cuff Company," and the like, which names refer to special branches of trade, cannot be set up to show acquiescence in the public use of the general word "celluloid."

Motion for Preliminary Injunction.

*Rowland Cox*, for the motion.

*John R. Bennett, contra.*

BRADLEY, Justice. The bill of complaint in this case states that the complainant was incorporated under the laws of New York in 1871, and has ever since that time used its corporate name in carrying on its business of the manufacture and sale of various compounds of pyroxyline, adapted to different uses and purposes, and that its name has become of great consequence in the good-will of its business, its standing, and the reputation of its goods; that, in order to designate its said manufactured product, and to distinguish it from similar compounds manufactured by others, the complainant, from the first, adopted and used the word "celluloid," which had never been used before, except to a limited extent by Isaiah S. and John W. Hyatt, by whom the word was coined, and who were engaged in the same manufacture at Albany, New York, and used the word as a trade-mark; and when complainant was incorporated the said Hyatts entered into its employ, and assigned to it all their rights relating to the business, good-will, and trade-mark; and complainant has ever since used the word "celluloid" as its trade-mark, by impressing or stamping it into the surface of the articles made from the manufactured product, whereby it has acquired a high reputation as denoting complainant's manufacture, and indicating goods of superior quality, as compared with like goods sold by other parties under the names of chrolithion, lignoid, pasbosene, etc.; that in 1873 complainant caused said word "celluloid" to be registered as a trade-mark in the United States patent-office, under the act in such case made and provided, and again registered in 1883, under the subsequent act. The bill then complains that the defendant, in order to deprive the complainant of its business and its rights, and to create an unfair competition, since the first day of January, 1886, has adopted the name of Cellonite Manufacturing Company, with intent that it should be mistaken for complainant's name, and intends to use it in the transaction of business similar to that of the complainant; that the similarity of names will embarrass and obstruct the business of the complainants, cause confusion and mistake, divert complainant's custom, reduce its sales, and deceive the public; that the defendant has commenced to erect works on an extensive scale for the manufacture of a compound of pyroxyline, to be put on sale under the name of "cellonite," a name purely arbitrary, and adopted to enable the defendant to sell the article as complainant's produce; that the corporators

who formed the defendant company had previously been engaged in the manufacture of pyroxyline compounds under the name of "pasbosene," "lignoid," "chrolithion," etc., but selected the new name, "cellonite," in order to trade upon the complainant's reputation, and to sell its product as the complainant's, and intends to stamp its goods with the word "cellonite," in imitation of the stamp on complainant's goods, in order to sell them as complainant's manufacture. The bill prays an injunction to prevent the defendant from using the word "cellonite," or any imitation of the word "celluloid." The allegations of the bill are verified by affidavits and exhibits.

The defendant has filed an answer, in which it denies that the complainant has any right to the exclusive use of the word "celluloid;" alleges that many companies use it in their names, as "Celluloid Brush Company," "Celluloid Collar & Cuff Company," etc., which have been allowed by complainant without objection. It admits the selection and use of the word by the complainant, but denies any exclusive right to the use of it, because it has become a part of the English language to designate the substance celluloid, and the impression of the word on the articles manufactured by complainant merely indicates the substance of which they are composed. It denies that the word "cellonite" was adopted for the purpose of imitating the name of complainant, or the name stamped on the complainant's goods. It avers that the word was adopted as far back as 1883, and has been continuously used ever since, not to imitate the word "celluloid," but selected as better describing the exact nature of the pyroxyline compound used by the defendant; the same being a compound of the well-known substances cellulose and nitre, "cellonite" being merely a compound derivative of those two words; that the defendant abandoned the use of the words "pasbosene," "lignoid," etc., because those words gave no information as to the chemical constituents of the compounds designated by them. It alleges that it has for four years been engaged in manufacturing and selling goods marked "Cellonite," and until now no attempt has been made to interfere with it. To show that the word "celluloid" is a word of common use, the answer cites various patents and books, (but all subsequent to 1873,) also the rules of the patent-office as to the classes of inventions, in which one of the sub-classes is "Celluloid."

The only verification of the answer is the oath of J. R. France, an officer of the company, who swears that the contents are true, so far as they are within his knowledge; and, so far as stated on information and belief, he believes them to be true.

The answer virtually admits that the corporators of the defendant had been engaged, before the formation of the defendant company, in the same manufacture, and had called their produce, "pasbosene," "lignoid," etc.; and that they adopted the word "cellonite," instead of those designated, for the reason, as the answer says, that it is more expressive of the constituents, *cellulose* and *nitre*. This is a somewhat singular explanation. The termination "ite," in chemistry, has a technical application nothing to do with the word "nitre;" and, notwithstanding

the denial of the answer, (which, however, cannot be regarded as verified by oath,) the inference strongly presses itself that the name was adopted on account of its similarity to "celluloid," as the complainant charges.

In alleging that the word "cellonite" has been used by the defendant since 1883, the defendant, which was not incorporated until May, 1886, identifies itself with the previous association, shown by the affidavits to have been called the "Merchants' Manufacturing Company," composed of the same corporators, who abandoned the old name, and assumed the new one, for some purpose or other. The explanation given for so doing is not entirely satisfactory. Here are two facts standing side by side: *First*, the fact that the Celluloid Manufacturing Company,—an old, well-established concern,—is doing a large and prosperous business, with a good-will resulting from many years of successful effort, and calls the product of its manufacture "celluloid," which has become such a popular designation that, as the defendant says, it has become incorporated in the English language; *secondly*, the fact that the Merchants' Manufacturing Company, which produces substantially the same article, and calls it by different names, "pasbosene," "lignoid," etc., (with what success we are not told,) suddenly changes its name to that of Cellonite Manufacturing Company, and calls its produce "cellonite." It will take a great deal of explanation to convince any man of ordinary business experience that this change of name was not adopted for the purpose of imitating that of the old, successful company.

It is the object of the law relating to trade-marks to prevent one man from unfairly stealing away another's business and good-will. Fair competition in business is legitimate, and promotes the public good; but an unfair appropriation of another's business, by using his name or trade-mark, or an imitation thereof calculated to deceive the public, or in any other way, is justly punishable by damages, and will be enjoined by a court of equity. The question before me is whether the law has been violated in the present case.

*First.* As to the imitation of the complainant's name. The fact that both are corporate names is of no consequence in this connection. They are the business names by which the parties are known, and are to be dealt with precisely as if they were the names of private firms or partnerships. The defendant's name was of its own choosing, and, if an unlawful imitation of the complainant's, is subject to the same rules of law as if it were the name of an unincorporated firm or company. It is not identical with the complainant's name. That would be too gross an invasion of the complainant's right. Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another. What similarity is sufficient to effect the object has to be determined in each case by its own circumstances. We may say, generally, that a similarity which would be likely to deceive or mislead an ordinary unsuspecting customer is obnoxious to the law. Judged by this standard, it seems to me that, considering the nature and circumstances of this case, the name "Cellonite Manufacturing Company"

is sufficiently similar to that of the "Celluloid Manufacturing Company" to amount to an infringement of the complainant's trade name. The distinguishing words in both names are rather unusual ones, but supposed to have the same sense. Their general similarity, added to the identity of the other parts of the names, makes a whole which is calculated to mislead.

*Secondly.* As to the complainant's alleged right to the exclusive use of the word "celluloid" as a trade-mark, and the defendant's alleged imitation thereof. On this branch of the case, the defendant strenuously contends that the word "celluloid" is a word of common use as an appellative, to designate the substance celluloid, and cannot, therefore, be a trade-mark; and, *secondly,* if it is a trade-mark the defendant does not infringe it by the use of the word "cellonite."

As to the first point, it is undoubtedly true, as a general rule, that a word merely descriptive of the article to which it is applied cannot be used as a trade-mark. Everybody has a right to use the common appellatives of the language, and to apply them to the things denoted by them. A dealer in flour cannot adopt the word "flour" as his trademark, and prevent others from applying it to their packages of flour. I am satisfied from the evidence adduced before me that the word "celluloid" has become the most commonly used name of the substance which both parties manufacture, and, if the rule referred to were of universal application, the position of the defendant would be unassailable. But the special case before me is this: The complainant's assignors, the Hyatts, coined and adopted the word when it was unknown, and made it their trade-mark, and the complainant is assignee of all the rights of the Hyatts. When the word was coined and adopted, it was clearly a good trade-mark. The question is whether the subsequent use of it by the public, as a common appellative of the substance manufactured, can take away the complainant's right. It seems to me that it cannot.

As a common appellative, the public has a right to use the word for all purposes of designating the article or product, except one,—it cannot use it as a trade-mark, or in the way that a trade-mark is used, by applying it to and stamping it upon the articles. The complainant alone can do this, and any other person doing it will infringe the complainant's right. Perhaps the defendant would have a right to advertise that it manufactures celluloid. But this use of the word is very different from using it as a trade-mark stamped upon its goods. It is the latter use which the complainant claims to have an exclusive right in; and, if it has such right, (which it seems to me it has,) then such a use by the defendant of the word "celluloid" itself, or of any colorable imitation of it, would be an invasion of the complainant's right. As a trade-mark it indicates that the article bearing it is the product of the complainant's manufacture. If another party uses it in that way, it indicates a falsehood, and is a fraud on the public, and an injury to the complainant. The essence of the law of trade-marks is that one man has no right to palm off, as the goods or manufacture of another, those that are not his. This is done by using that other's trade-mark, or adopting any other means

or device to create the impression that goods exhibited for sale are the product of that other person's manufacture when they are not so.

The subject is well illustrated by the case of *McAndrew* v. *Bassett*, 4 De Gex, J. & S. 380. The plaintiffs produced a new article of liquorice, and stamped the sticks with the word "Anatolia," some of the juice from which they were made being brought from Anatolia, in Turkey. The article becoming very popular, the defendants stamped their liquorice sticks with the same word. Being sued for violation of plaintiff's trade-mark, one of their defenses was that no person has a right to adopt as a trade-mark a common word, like the name of a country where the article is produced. Lord Chancellor WESTBURY said:

"That argument is merely the repetition of the fallacy which I have frequently had occasion to expose. Property in the word, for all purposes, cannot exist; but property in that word, as applied by way of stamp upon a particular vendible, as a stick of liquorice, does exist the moment the article goes into the market so stamped, and there obtains acceptance and reputation, whereby the stamp gets currency as an indication of superior quality, or of some other circumstance which renders the article so stamped acceptable to the public." Page 386.

Another case throwing light on the subject is that of *Singer Machine Manuf'g Co.* v. *Wilson*, 3 App. Cas. 376. There the defendant, a manufacturer and vendor of sewing-machines, inserted in his price-list, among other articles for sale, the "Singer Sewing-Machine," and sold machines by that name, but having his own trade-mark upon them. The plaintiff sued him on the ground that by a Singer sewing-machine was understood in the community a sewing-machine made by Singer, the inventor, or by the plaintiff, his assignee and successor in business. The plaintiff contended, therefore, that the advertisement was a fraud on the public, and an invasion of its exclusive right to the name "Singer." The defendant contended that the terms "Singer Sewing-Machine" meant a particular kind of machine, (which he described,) irrespective of who manufactured it; that the word "Singer" had come to be descriptive in its character, and would not have the effect attributed to it by the plaintiff. The judges who delivered opinions in the case, held that if the use of the name "Singer" gave the public to understand that the defendant sold machines made by the plaintiff, it was a wrong done to the plaintiff; but that if the name had come into common use as a name of a particular kind of machine, irrespective of the maker, the defendant had a right to use it in his advertisements in that sense, using his own trade-mark on the article itself; and it was held by all the judges that it was a matter to be determined by evidence whether the use of the name in the advertisement had the one effect or the other.

This, it will be observed, was a case of advertising, and not of imitating a trade-mark. Still, if it had the same effect, it was held to be equally culpable. The case does not decide that, if the word "Singer" had been the plaintiff's trade-mark, any change in its use would have affected such trade-mark, but does decide that an extension of its use might render the word harmless in an advertisement.

The defendant's counsel in the present case placed great reliance on the decision in *Cloth Co. v. Cloth Co.*, 11 H. L. Cas. 523. After carefully reading that case, I do not see that it necessarily governs the present. No question was made as to the names of the companies. The trade-mark there was a large circular label stamped upon the cloth, containing, within its circumference, the name of the former company which carried on the manufacture, and the places where it had been carried on, thus: "Crockett International Leather Cloth Company, Newark, N. J., U. S. A.; West Ham, Essex, England." Within the circle were, first, the figure of an eagle, displayed, under the word "Excelsior," and then certain announcements in large type, as follows: "Crockett & Co. Tanned Leather Cloth; patented Jan'y 24, '58. J. R. & C. P. Crockett, Manufacturers." The court held this label to be partly trade-mark and partly advertisement; and, as the cloth was not patented, and J. R. & C. P. Crockett were not the manufacturers, the court was inclined to agree with the lord chancellor that these statements invalidated the label as a trade-mark; but Lords CRANWORTH and KINGSDOWN preferred to place their decision against the plaintiff on the ground that the defendants' label did not infringe it. They pointed out differences in figure, and showed that the announcements were different; and the defendants' announcement being "Leather cloth, manufactured by their manager, late with J. R. & C. P. Crockett & Co.," without any reference to a patent, Lord KINGSDOWN said:

"The leather cloth, of which the manufacture was first invented or introduced into the country by the Crocketts, was not the subject of any patent. The defendants had the right to manufacture the same article, and to represent it as the same with the article manufactured by the Crocketts; and, if the article had acquired in the market the name of Crocketts' leather cloth, not as expressing the maker of the particular specimen, but as describing the nature of the article by whomsoever made, they had a right in that sense to manufacture Crocketts' leather cloth, and to sell it by that name. On the other hand, they had no right, directly or indirectly, to represent that the article which they sold was manufactured by the Crocketts or by any person to whom the Crocketts had assigned their business or their rights. They had no right to do this, either by positive statement, or by adopting the trade-mark of Crockett & Co., or of the plaintiffs to whom the Crocketts had assigned it, or by using a trade-mark so nearly resembling that of the plaintiff as to be calculated to mislead incautious purchasers."

It seems to me that the true doctrine could not be more happily expressed than is here done by Lord KINGSDOWN. There is nothing in the case, nor in the opinions of any of the judges, adverse to the claim of the complainant.

There is a case in the New York Reports (*Selchow v. Baker*, 93 N. Y. 59) which comes very near to that now under consideration. That was the case of "sliced animals," and other "sliced" objects, being a term used by the plaintiff as a trade-mark to designate certain puzzles manufactured and sold by them, in which pictures of animals, etc., on cardboard, were sliced up in pieces, and the puzzle was to put the pieces together and make the animal. The label "Sliced Animals," etc., was

used by the plaintiffs on all boxes of these goods sold by them. The defendants infringed, and the question was whether this kind of designation could avail as a trade-mark. Judge RAPALLO, in delivering the opinion of the court, after reviewing many cases on the subject, concludes as follows:

"Our conclusion is that where a manufacturer has invented a new name, consisting either of a new word or a word or words in common use, which he has applied for the first time to his own manufacture, or to an article manufactured by him, to distinguish it from those manufactured and sold by others, and the name thus adopted is not generic or descriptive of the article, its qualities, ingredients, or characteristics, but is arbitrary or fanciful, and is not used merely to denote grade or quality, he is entitled to be protected in the use of that name, notwithstanding that it has become so generally known that it has been adopted by the public as the ordinary appellation of the article."

This case is so directly in point that it seems unnecessary to look further. I think it perfectly clear, as matter of law, that the complainant is entitled to the exclusive use of the word "celluloid" as a trade-mark.

The only question remaining to be considered, therefore, is whether the defendant, by the use of the word "cellonite," as a trade-mark, or impression upon its goods as a trade-mark, does or will infringe the trade-mark of the complainant. Is the word "cellonite" sufficiently like the word "celluloid," when stamped upon the manufactured articles, to deceive incautious purchasers, and to lead them to suppose that they are purchasing the products of the same manufacturers as when they purchased articles marked "celluloid?" I think this question must be answered in the affirmative. I think that, under the circumstances of the case, the word "cellonite" is sufficiently like the word "celluloid" to produce the mischief which is within the province of the law. I say, under the circumstances of the case. By that I mean the previous nomenclature applied to the articles as manufactured by different persons. The complainant has always stamped its goods with the word "celluloid." Other manufacturers have called the product as manufactured by them by names quite unlike this, as "pasbosene," "lignoid," "chrolithion," etc.; so that a wide difference in designation and marking has existed between the complainant's goods and those of all others. The adoption now of a word and mark so nearly like the complainant's as "cellonite" cannot fail, it seems to me, to mislead ordinary purchasers, and to deceive the public.

The defendant, however, sets up two grounds of defense against the application for an injunction outside of the merits of the case: *First,* that the complainant has acquiesced in the use of the word "celluloid" in the names of a great number of other companies, several of which are enumerated in the answer, such as the "Celluloid Brush Company," the "Celluloid Collar & Cuff Company," and the like; and, by such acquiescence, has lost any right to complain of such use by other companies. But it is obvious that such special names, indicating confinement to a particular branch of the trade, are wholly unlike the complainant's

general name of "Celluloid Manufacturing Company." Besides this, it is altogether probable, as we gather from one of the affidavits, that these branch companies are mostly licensees of the complainant, and very properly use the word "celluloid" in their names. We think that this defense cannot justly prevail.

The other is of somewhat the same character,—supposed laches and acquiescence on the part of the complainant, in allowing the defendants themselves, for three or four years prior to the suit, to use the word "cello-nite," stamped on their articles of manufacture, and in their business name. How the defendant could have done this before its own exist-ence is difficult to understand. But, suppose it is meant that it was done by the corporators and predecessors of the defendant, there is no proof that it ever came to the knowledge of the complainant; and the fact that the previous name used under the former corporate organization was that of the "Merchants' Manufacturing Company" is sufficient to afford the com-plainant *prima facie* ground of excuse for not having learned of the alleged use of the word "cellonite," if it ever was used. I do not think that either of these defenses can avail the defendant. My conclusion is that the complainant, as the case now stands, is, in strictness, entitled to an injunction to restrain the defendant from using the name "Cellonite Manufacturing Company," or any other name substantially like that of the complainant; and from using the word "cellonite" as a trade-mark or otherwise, upon the goods which it may manufacture or sell, or any other word substantially similar to the word "celluloid," the trade-mark of the complainant.

But my great reluctance to grant a preliminary injunction for suppress-ing the use of a business name, or of a trade-mark, in any case in which the matter in issue is a subject for fair discussion, and admits of some doubt in the consideration of its facts, induces me to withhold the order for the present, on condition that the defendant will agree to be ready to submit the cause for final hearing at the next stated term of the court, which commences on the fourth Tuesday of September. It is possible that additional evidence, or a fuller verification of the allegations of the answer, may so modify the facts of the case presented for consideration as to lead to a change of views on the question of infringement, or of excuse therefor. At all events, it will be more satisfactory not to render judgment in the case until the defendant has been fully heard, and when it would have a right of immediate appeal. Should the defendant not be ready for a hearing at the time indicated, the present motion may be renewed without additional argument, or the complainant may take such other course as it shall be advised.

At the September term no further evidence was offered, and an order for injunction was granted without opposition.