THE CHARLES S. HIGGINS Co., Respondent, *v.* THE AMALGA SOAP Co. et al., Appellants.

(City Court of Brooklyn — General Term, November, 1894.)

Equity will restrain the use of a name which has become, in connection with other *indicia,* the chief means in commerce of distinguishing a proprietary article of merchandise from others of the same class, even where that name has been acquired through the instrumentalities of the laws for the incorporation of business companies, if it was done with the fraudulent intent and purpose of stealing the trade of another.

Plaintiff is the owner and manufacturer of a soap known to the public as the "Charles S. Higgins' German Laundry Soap," "Higgins' German Laundry Soap" and "Higgins' Laundry Soap." The defendant Donovan subsequently organized a company, to which he procured one Walter Higgins to give his name, and thereafter manufactured and permitted the Amalga Soap Co. to manufacture soap under the name of "Walter Higgins' Turkish Laundry Soap," put up in packages similar in size and shape to those of the plaintiff, and bearing the same devices, except as to the name and the substitution of a picture of a Turk smoking a pipe for that of a colored woman at the washtub. *Held,* that there was such an imitation of plaintiff's soap as was calculated and designed to deceive the public, and that an injunction restraining the use of wrappers similar to those of the plaintiff and the use of the word "Higgins" in designating the soap made by defendants was properly granted.

APPEAL from final judgment restraining the defendants from making and selling soaps wrapped in wrappers similar to those of the plaintiff, and from the use of the word "Higgins" to designate the soaps made by them.

*Edward M. Grout,* for appellants.

*Jesse Johnson,* for respondent.

VAN WYCK, J. From the evidence herein, which fully sustains the findings, it appears that from 1880, and in fact from a period long prior thereto, Charles S. Higgins and his associates had been engaged in the business of manufacturing and selling laundry soap. It was put up in cakes, each being a parallelopiped four and one-half by two and one-fourth by one and three-fourth inches, weighing three-quarters of a

pound, the two larger surfaces of the same being surrounded by a raised rim and having impressed on one of the panels so formed the words " Chas. S. Higgins' German Laundry Soap," and on the other the corresponding words in German, each cake being perfumed with citronella oil and inclosed in a blue wrapper upon which were printed " Chas. S. Higgins' German Laundry Soap," with a picture of a colored woman washing in a tub between the words " Chas. S. Higgins " and the words " German Laundry Soap," and the directions for the use thereof both in German and English.    This brand of soap was extensively advertised at great expense, becoming one of the best known laundry soaps in the Metropolitan market.    It was very generally used and known to the washing public as " Chas. S. Higgins' German Laundry Soap," or " Higgins' German Laundry Soap " or " Higgins' Laundry Soap," and was easily identified in the minds of the common users thereof by the shape, size and perfume of the cake and by the wrapper, on both of which the name of Higgins was indelibly impressed, save as the name on the cake itself was effaced in the lather of the washtub, and then it would be too late to substitute another kind of soap without the actual consent of the laundress.    The plaintiff, by assignment, became duly possessed, in 1890, of all the rights of Charles S. Higgins and his associates in this brand of soap, with the good will, trademarks and rights appurtenant thereto, and has ever since been engaged in the business of making and selling the same, put up in the same manner in every respect as it was by its assignors.

In 1886 envious greed seems to have impelled the defendant John Donovan, Jr., to make an effort by " an unfair competition in trade " to share with Charles S. Higgins and associates the value which they have given to this brand of soap by their energy, skill, expenditures and honesty to customers. He conspired with others to accomplish such result by deceiving imitations of the brand.    The first and most necessary step was to acquire in some manner the use of the name " Higgins," so he and his associate Bronson bought from

Walter De Witt Clinton Higgins his consent to name a corporation which they were about to form "The Walter Higgins Manufacturing Company," and paid therefor $1,000 of the stock. This accomplished, then they commenced the business of making and selling Higgins' laundry soap, by degrees imitating more closely the *indicia* by which "Chas. S. Higgins' Laundry Soap" was known and identified, till their cakes were of the same size, shape, character and perfume and inclosed in a wrapper of the same color, and upon both cake and wrapper were impressed or imprinted the same devices, pictures and words, differing only in the substitution of the words "Walter Higgins Manf'g Co.," "Turkish Laundry Soap," for those of "Chas. S. Higgins' German Laundry Soap," and of the picture of a Turk and his pipe for that of a colored woman at the washtub. The defendant "The Amalga Soap Co." is now making and selling this laundry soap put up in the manner indicated, and Donovan is paid a commission for selling the same. It is clear that such imitations were calculated and intended to deceive, and did deceive the public into purchasing the spurious goods in the belief that they were buying the goods of plaintiff. The defendants are engaged in an unfair competition in trade, appropriating to themselves the valuable good will in trade which has been created by the labor, skill, expenditures and good faith of others. This a court of equity will not countenance. The injunction herein should be upheld, including that part of it which prohibits the use of the name of Higgins in designating soap, which was fraudulently given to this corporation for the purpose of carrying out the illegal and inequitable design of invading the rights of the owners of the brand of soap known as the "Chas. S. Higgins' Laundry Soap."

It has been asserted by some of the most eminent jurists that the just demand for relief from the hardships resulting from the strict application of the inflexible rules of the common law to the affairs of life was the real origin of the English Chancery Court. Whether this is correct or not, our courts of equity, judging from the reported decisions, have

conservatively avoided the announcement of inflexible rules with the idea that they will fit all cases, resting content with the consideration of the special equities in the given case. Their tendency has been to develop and broaden the jurisprudence in the class of cases of which this is one, so as to respond to the demands of natural justice in its application to new methods of business and new forms of schemes for the invasion of the rights incident to the good will in trade honestly acquired. Equity should not hesitate to enjoin the use of a name which has become, in connection with other *indicia*, the chief means in commerce of distinguishing the proprietary article of merchandise from others of the same class, even where that name has been acquired through the instrumentalities of the laws for the incorporation of business companies, if it was done with the fraudulent intent and purpose of stealing the trade of another, for it is " an unfair competition in trade " which should not be encouraged or permitted. While a person can change his name under the law, he should hardly be permitted to use it as the means of sharing the advantages with another in his valuable proprietary article, if the name was so changed with the fraudulent intent and design of accomplishing that purpose. It is well to bear in mind that Walter De Witt Clinton Higgins is not restrained from using his name, for he was not made a party to this action, having abandoned and disassociated himself from the artful project to rob Charles S. Higgins and associates of their trade in the very infancy of the disreputable undertaking. Defendant Donovan, alone of the pioneers in this movement, has persistently pursued the scheme, taking in and dropping out from time to time new associates, until he made his present combination with the defendant, the " Amalga Soap Co." which is now engaged in pirating the trade of plaintiff by manufacturing and clothing soap in the objectionable dress hereinbefore described, and paying Donovan for selling the same a commission for which he has never accounted to the " Walter Higgins Manf'g Co."

We refer to the following authorities in support of our

views: *Cohn* v. *Gottschalk*, 16 N. Y. St. Repr. 818; *Fischer* v. *Blank*, 138 N. Y. 244; *Morgan Sons Co.* v. *Troxell*, 23 Hun, 632, 640; *Newman* v. *Alvord*, 51 N. Y. 189; *Celluloid Manfg. Co.* v. *Cellonite Manfg. Co.*, 32 Fed. Rep. 94; *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Manfg. Co.*, 37 Conn. 278; *Hendricks* v. *Montagu*, 50 L. J. Rep. Ch. 456; *Merchants' Detective Association* v. *Detective Mercantile Agency*, 25 App. Ct. Rep. (Ill.) 259; *Le Page Co.* v. *Russian Cement Co.*, 2 U. S. Circ. App. 555; *Taylor* v. *Carpenter*, 2 Sandf. Ch. 613; *McLean* v. *Fleming*, 98 U. S. 245.

The judgment should be affirmed, with costs.

OSBORNE, J., concurs.

Judgment affirmed, with costs.