**DUPONT CELLOPHANE CO., Inc., v. WAXED PRODUCTS CO., Inc.***

No. 266.

Circuit Court of Appeals, Second Circuit.

July 17, 1936.

76

Watson, Bristol, Johnson & Leavenworth, of New York City (Thomas D. Thacher, Ellis W. Leavenworth, and L. A. Janney, all of New York City, of counsel), for defendant-appellant.

Nims & Verdi, of New York City (Harry D. Nims, C. R. Mudge, of Wilmington, Del., and J. Hanson Boyden, of Washington, D. C., of counsel), for complainant-appellee.

Hugh M. Morris, of Wilmington, Del., amicus curiæ speaking for Societe LaCellophane, Kalle & Co. Aktiengesellschaft, The Cellophane Company, Limited.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a suit brought by the complainant, a wholly owned subsidiary of E. I. DuPont de Nemours & Co., for the infringement by the defendant of the alleged trade-mark "Cellophane" through using the same in connection with goods not of the complainant's manufacture.

The defendant purchases goods from Sylvania Industrial Corporation, which is a manufacturer of cellulose transparent sheets and is one of the complainant's principal competitors and has been in the habit of supplying cellulose transparent wrappings manufactured by Sylvania to customers who order cellophane sheets and billing them as "cellulose." The material thus sold by defendant to the public was billed and labeled "cellulose" because it was told by Sylvania at the outset not to use the name "Cellophane."

The trial court held that the complainant was the owner and was alone entitled to use the trade-mark "Cellophane" and that the defendant had infringed its exclusive rights by supplying transparent cellulose films, which were not manufactured by the complainant, in response to requests for cellophane from its customers. There was no proof, however, that any individual buyer from the defendant thought that he was obtaining complainant's product when he purchased goods from the defendant. On the ground that the complainant owned the exclusive right to the use of the trade-mark "Cellophane," an interlocutory decree was granted to the latter restraining the defendant from using the word cellophane in connection with any product not made by complainant and from filling any orders for cellophane with any such product without explaining to the purchaser that it was a different brand of transparent cellulose film from that of the complainant. It was also ordered in the interlocutory decree that the complainant recover profits and damages because of the foregoing infringement.

The trial judge having found that the complainant at one time had the right to prevent the use of the word "cellophane" by others concluded that this right could only cease, if voluntarily abandoned. Hence much of the opinion of the court below was devoted to showing that there was no abandonment. We do not differ with it in respect to the question of abandonment and think that it was fairly established that the complainant endeavored to retain its rights and that abandonment,

which depends on a voluntary surrender of the trade-mark to the public, did not occur. Hanover Milling Co. v. Metcalf, 240 U.S. 403, 419, 36 S.Ct. 357, 60 L.Ed. 713; Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60.

In our opinion this case does not properly turn on abandonment, nor does it even turn on the question whether the word cellophane was at one time more than a descriptive term. The real problem is what it meant to the buying public during the period covered by the present suit. In other words, did it simply mean a transparent glycerinated cellulose hydrate regenerated from viscose, and nothing more, or did it mean such an article of commerce manufactured by or originating with the complainant?

The court below made a finding that the name "characterizes a single thing coming from a single source, and is a valid trademark, even if it should be shown that the product is more emphasized than the producer or that the identity of the producer is unknown." This finding seems to us not only not warranted by the evidence but clearly disproved.

The product and use of cellophane in commerce is attributed to one Brandenberger, of Bezons, France, at about the year 1909. He coined the word "cellophane" as suggesting a product made of cellulose and transparent, and registered "La Cellophane" written in a fancy script as a trade-mark. It would have served as a useful trade-mark, at least in the beginning, if it had not almost immediately lost ground as such because it was employed to describe the article itself. Indeed, no other descriptive word was adopted. In answer to the question whether "Cellophane was the name by which that new product was christened by Mr. Brandenberger," Mr. Yerkes, the DuPont president, said: "I considered that Cellophane was the name which he gave to the product which he invented." That Brandenberger used the word cellophane in a generic sense is evident from his United States patents Nos. 1,226,897 and 1,406,148. In the first he said: "The invention relates to a label made of cellophane." And in the second he not only used the word generically in the specification, but he also had a claim reading thus: "4. A band, as claimed in Claim 2 in which the cellulosic material consists of cellophane."

The early importations from the French manufacturer into the United States beginning in 1912 had labels on which "La Cellophane" was inscribed. At first the words were written in the label and afterwards printed in order, as Euler, the American agent, intimated, to show "what the package contained." (Record p. 764.) In connection with sales of the product Euler also distributed some labels of his own on which were inscribed the words: "'Wrapped in LaCellophane' or something like that." At this early stage Euler distributed circulars to his customers advertising "La Cellophane" as "the most interesting article put on the market in many years—a transparent parchment tissue of the highest merit," and added:

"La Cellophane does not break.

"La Cellophane does not stick.

"La Cellophane does not smell.

"La Cellophane has no taste.

"La Cellophane will not dissolve in water, alcohol or grease.

"La Cellophane is impermeable, always soft, waterproof and chemically pure.

"La Cellophane is tough, flexible, transparent and free from oxydes.

"La Cellophane is an ideal wrapper for any article that must be protected from outside influences.

"La Cellophane is sold in the stock size sheets, 24 x 36, or imported in any desired size.

"La Cellophane is now in use by nearly all the leading confectioners because they can't keep away from the peerless package-wrapping, paper."

While he warned the trade in the foregoing circular that "La Cellophane" is registered in the United States Patent Office and infringers would be prosecuted, he again and again used the words as descriptive of the cellulose product. He thus used it in advertising in the Confectioner's Journal in the years 1913, 1916, and 1921–1924.

A research on cellulose by Cross & Bevan published in 1912 contained the following statement: "The 'viscose film' (cellulose) under the powerful auspices of the Societe Industrielle de Thaon is at length a fait accompli, and is an article of commerce under the descriptive term 'Cellophane.'[1] The film is produced in a great variety of decorated forms which find corresponding applications. * * *"

In June, 1913, an article in the Journal of Industrial and Engineering Chemistry stated that: "Paper coated with 'Cellophane' is claimed to possess more technical advantages than lead, tin, zinc, and aluminum ('Alolit') foils, mainly owing to its lightness, non-oxidizability and cleanness; in addition, Muller states that it is gas-tight. 'Cellophane' is insoluble in water and alcohol, and it may be treated with boiling water without indications of decomposition."

In the Literary Digest of March 7, 1914, the use of cellophane as a wrapping was discussed, and in the New York Times of March 11, 1915, its use as a wrapper for candy boxes and a lining for cigar boxes was mentioned.

In 1917–18 there were reports of the United States Chemical Warfare Service in which the use of cellophane in connection with gas masks was discussed.

In Volume 13, 1919, of the American Chemical Society, there was an article as to the use of cellophane in photography.

In January, 1922, Birn & Wachenheim, who were acting as agents for the French manufacturers, distributed to the American public 10,000 copies of a circular printed in France on cellophane. It read: "La Cellophane Bezons * * * the ideal transparent wrapper can be furnished in all sizes, in all colors."

In 1922, the Court of Customs Appeals rendered an opinion in which the term "cellophane" was employed many times to describe the product involved in the litigation.

In 1923, in an appeal from the Board of General Appraisers to the United States Court of Customs Appeals, the word "cellophane" was constantly used by the witnesses as a descriptive term.

It seems quite evident that the French manufacturers and their agents, as well as the relatively limited public that were interested in using these cellulose films before DuPont entered the field, constantly employed the word "cellophane" to describe the product and that it was used in a generic sense from the beginning.

The DuPont Cellophane Company, Inc., was incorporated in June, 1923, "to manufacture, buy, sell, import * * * cellophane, transparent wrapping material, viscose products, textiles, fabrics, materials and articles manufactured from viscose * * *."

The French interests, patents, the trade-mark "Cellophane" and the business of exporting films to the United States, the certificate of registration, together with the good will of the business in which the trade-mark "La Cellophane" was used, were assigned by the French manufacturers to the DuPont Company on October 13, 1923. Thereupon DuPont published the following announcement:

"DuPont Cellophane Co. Inc.

"Announces that as of August 1st, 1923, they have secured the exclusive sales and manufacturing rights of the product known as Cellophane and manufactured by La Cellophane of Bezons, France.

"We are now importing this product and all inquiries will receive our prompt attention."

In October, 1923, DuPont published in the DuPont Magazine a statement that:

"The manufacture of cellophane, a transparent cellulose product, used largely in millinery for decoration and in other trades for wrapping purposes, is to be started in the United States by the DuPont Cellophane Company. * * * A plant to cost approximately $2,000,000 is now being constructed on the Niagara River, at Buffalo, New York, adjoining the factory of the DuPont Fiber-silk Company. This will be the first plant to manufacture this product in the United States.

"Cellophane has been produced in France for the past several years and its use is extending for wrapping purposes for confectionery, biscuits, cakes, tea, coffee, cocoa, meat products and in fact, for nearly all articles of food. It is also used as a wrapping material for packages of perfumery, soap, various toilet preparations, pharmaceutical and other products.

"It is an important addition to the list of cellulose products by chemists during the last several years for commercial uses. It is non-gelatinous, will not melt in boiling water or decay. * * *

"The DuPont Cellophane Company has obtained patent rights for North America and, pending completion of its factory at Buffalo, will be the selling agents in this country for the product which the company is now importing."

In December, 1923, the DuPont Magazine published an article giving a sketch of the development of its cellulose product entitled "That New Wood Product—Cello-

phane." The word "cellophane" was used many times as a term descriptive of the particular product to be marketed.

On December 28, 1923, DuPont applied for registration of the name "Du Pont Cellophane" in an oval frame as a trade-mark and registration was granted on July 22, 1924. It never used "La Cellophane" or "Cellophane" in distinctive script, the old marks of the French company, until 1932, when it applied for re-registration of those marks in which it claimed rights by assignment. In January, 1924, Yerkes wrote a letter to the Patent Office, in support of the application to register the mark "DuPont Cellophane" in an oval frame, and argued that cellophane should be entered in Class 50 as "Merchandise not otherwise classified." With his letter he sent the department a copy of the article of December, 1923, in the DuPont Magazine from which we have already quoted. He used the word "cellophane" throughout his letter in a generic sense, spelling it with a small "c."

In August, 1924, the DuPont Company began to advertise to the candy trade and published a double page advertisement in the "Manufacturing Confectioner" with the heading: "Cellophane—the new super-wrap is now available for your holiday line," and below it the new mark "DuPont Cellophane" in an oval frame. In December, 1924, there was published in the Du-Pont Magazine an article entitled: "Selling with Cellophane." "How manufacturers and others are using this material to speed up sales." It described the development of the product in France and in this country and its many uses for enclosing delicate fabrics on display at dress-goods counters, for making artificial flowers, and beads, for trimming hats and for wrapping fruits, nuts, cakes, candies, soaps, perfumes, cigarette packages, and cigars.

In 1925 the DuPont Company published 212 advertisements in 25 trade journals. This advertising continued on a large scale in 1926 and thereafter until the business was reincorporated in 1929 and the complainant became the owner. The advertising bore the trade-mark "DuPont Cellophane" set in an oval frame and at times carried a warning notice such as: "Look for the DuPont Cellophane Oval on every package of Cellophane. It is your guarantee of the added tensile strength, purity and perfection, that only DuPont chemical control, research and supervision can assure."

In July, 1926, and thereafter, the advertising carried in addition to the oval mark the statement that: "DuPont Cellophane is an unusual material, patented and trade-marked, used for wrapping and many other purposes * * *." On its labels the DuPont Company placed the oval trade-mark, and in 1926 added the statement: "This package is sold subject to the express license restriction, to which each purchaser agrees by the acceptance hereof, that no purchaser shall resell the contents, whether cut to size or not, except under the registered trade mark name 'DuPont Cellophane.' "

In addition to the use of cellophane as a descriptive term in advertising and on trade labels, articles were published in 1923 and 1924 in magazines such as the Literary Digest, the Scientific American, and the trade journal Paper, which clearly used cellophane in a generic sense. In the Dictionary of Tariff Information of the United States Tariff Commission there appeared, in October, 1924, the following:

"Cellophane. Cellophane and visca are cellulose products precipitated from the plastic solution of chemically dissolved wood pulp or cotton * * *. Up to 1924, cellophane has been imported exclusively from France, where a single company controlling the patents virtually has a monopoly of its manufacture."

In an advertisement in the Confectioner's Journal for October, 1924, is the statement: "Each box is wrapped in cellophane paper." And in the Confectioner's Journal for April, 1925, advertising lolly pops is the slogan: "Wrapped in Cellophane," and "Cellophane wrapped." Sometimes the advertisements would read: "Wrapped in La Cellophane Paper." In an advertisement in the Confectioner's Journal of April, 1924, by the Nichols Candy Company was the statement: "Ten big pieces of old-fashioned butter scotch in a vivid-hued band, wrapped safely in cellophane."

In 1927 the DuPont Company began to place on its labels underneath the oval mark, in small type, the statement that: "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films." Its general manager testified that if he wanted to buy from a dealer the

particular product, which is a hydrate, and he wished the dealer to understand that he did not desire to buy an acetate or glassine, cellophane was the only word to use that would be understandable. (Record p. 81.)

In addition to the advertising we have mentioned, the DuPont Company also directly stimulated its customers to advertise in order "to obtain the utmost value from the use of Cellophane" (page 1525) and for that purpose sent to them specimens of advertising of cellophane for wrapping cigarettes, cigars, rolls, pies, biscuits, sausages, peanuts, coffee, clothing, and medicines. The extent of the advertising was enormous. It admittedly reached billions, and in it no connection with DuPont ordinarily was mentioned. (Record p. 60.)

As might have been expected, the customers of the defendant Waxed Products Company, Inc., testified that when ordering cellophane they did not intend to specify an article manufactured by any particular concern but simply wanted a satisfactory commodity. To the purchasers of Sylvania's goods the word cellophane meant the product, and not a brand. (Record p. 310, 314, 318, 405, 445, 541.) A survey by the defendant among retail dealers indicated that 88 per cent. of them knew no other name than cellophane which they could use if they wished to buy the particular article. The accuracy of their answers is confirmed by the statement in the DuPont Magazine of June, 1929: "Say 'Cellophane' to the next person you meet, and the chances are he or she will at once think of a wrap for packages of candy, bacon and the like. This is because people readily associate the product with its best known use as a means of keeping merchandise protected and yet completely visible."

To the question whether "cellophane" is a trade-mark, directed at the instigation of the DuPont Company to 17,000 selected subscribers of the Delineator, Good Housekeeping, Saturday Evening Post, and Ladies Home Journal, 72 per cent. of the subscribers answered that it was. This left 28 per cent. to whom the word gave no indication of origin. The answers did not show that the source was DuPont, but only that the goods were manufactured by one concern. Moreover, as they were induced by flattering letters from the magazines and by offers of prizes in return for prompt replies, they might well have stimulated a search for a registered trade-mark that theretofore had been unknown. Such proofs have no great weight.

The course of conduct of the complainant and its predecessors, and especially complainant's advertising campaign, tended to make cellophane a generic term descriptive of the product rather than of its origin and, in our opinion, made it so to at least a very large part of the trade.

The expiration in 1928 of United States patents No. 991,267 and No. 1,002,634 to Brandenberger for processes for manufacturing and drying films terminated any right the complainant had to the exclusive use of the name cellophane so far as it had become merely descriptive of the product itself. Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Linoleum Manufacturing Company v. Nairn, L.R. 7 Ch.Div. 834. The fact that it had registered "Cellophane" as a trade-mark would give it no right to monopolize a term useful to designate a commercial article. Others might employ it to designate their goods but should guard against misleading any customer who might intend to buy cellophane manufactured by the DuPont Company. As has often been said, a trade-mark is only property in a limited sense. It may be transferred with a business, but the only right which the owner of the mark acquires against competitors is "to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his." Prestonettes, Inc., v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731; Hanover Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; Delaware & H. Canal Company v. Clark, 13 Wall. 311, 20 L.Ed. 581.

The case of Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, is said to be inapplicable to the present facts because others made and sold the product under the trade-mark of "Transparit," and the Sylvania Company itself sold it under the marks of "Fenestra," "Sylphrap," and "Nymphrap" in considerable quantities. While the existence of such competition is relevant on the question whether cellophane became a descriptive word, the evidence we have summarized demonstrates that "cellophane" is used to designate the cellulose product we are concerned with, far more commonly than any other term, and is certain-

ly the descriptive word in general use. Competition was only important as an element bearing on that issue. The Singer decision is likewise said to be inapplicable for the reason that the expiration of the Brandenberger patents was of no importance because ways of making cellophane had been known long prior to the Brandenberger inventions. But his patents disclosed a process for preparing cellulose films without a supporting surface, while the earlier patents to Chorley and Stearn & Woodley did not solve the problem of making the films without such a supporting surface and avoiding the shrinkage and damage to the material likely to occur when dried thereon. There was no proof sufficient to show that the Brandenberger patents were worthless or to rebut the presumption of validity accompanying patents, or to meet the statements of Cross & Bevan in their publication Researches on Cellulose as to Brandenberger's substantial contributions to the art. (Record, 2055, 2056.) Certainly to some extent at least his patents "afforded shelter against the competition of others" and brought the case within the Singer decision. Horlick's Food Co. v. Elgin Milkine Co., 120 F. 264, 266 (C.C.A.7).

But neither the absence of a patent nor its complete invalidity will prevent a word from obtaining a generic meaning. As Justice Bradley said in Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C.C.) 32 F. 94, 98, about the word "celluloid": "As a common appellative, the public has a right to use the word for all purposes of designating the article or product, except one,—it cannot use it as a trade-mark, or in the way that a trade-mark is used, by applying it to and stamping it upon the articles. The complainant alone can do this, and any other person doing it will infringe the complainant's right. Perhaps the defendant would have a right to advertise that it manufactures celluloid. But this use of the word is very different from using it as a trade-mark stamped upon its goods."

In the case at bar the defendant has never used either the words "cellophane" or "DuPont Cellophane," with or without the oval, on its goods. It has merely filled orders for cellophane with its own product.

The District Court erred in concluding that "the trade-mark cellophane does not depend upon what was in the customer's mind" and in deciding the case on the theory that the public understanding as to the meaning of the word was immaterial. Such a theory is out of accord with the essence of the law of trade-marks. The rights of the complainant must be based upon a wrong which the defendant has done to it by misleading customers as to the origin of the goods sold and thus taking away its trade. Such rights are not founded on a bare title to a word or symbol but on a cause of action to prevent deception. It, therefore, makes no difference what efforts or money the DuPont Company expended in order to persuade the public that "cellophane" means an article of DuPont manufacture. So far as it did not succeed in actually converting the world to its gospel it can have no relief.

As was said in Bayer Co. v. United Drug Co., 272 F. 505, 509 (D.C.): "The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending? If they understand by it only the kind of goods sold, then * * * it makes no difference whatever what efforts the plaintiff has made to get them to understand more. He has failed, and he cannot say that, when the defendant uses the word, he is taking away customers who wanted to deal with him."

In the Bayer Case the plaintiff was granted a decree enjoining the defendant from using the trade-name "aspirin" in sales to chemists, physicians, and retail druggists who had been educated to understand that the word meant goods of the plaintiff's manufacture. On the other hand, the defendant was allowed to sell direct to consumers under the name "aspirin" because it was shown that to them that word meant the article and not the source of manufacture.

A similar situation arose in Ford v. Foster (1872) L.R. 7 Ch.App. 611. There the plaintiff called goods of its manufacture "Ford's Eureka Shirt." Later the defendant made and sold (as he had a right to do) a shirt of the same style and sold it as a "Eureka" shirt, labeling it as such. The plaintiff sued to restrain the interference with his trade-mark and for an accounting. From the evidence it appeared that "Eureka" to the dealers in shirts had become generic as referring to the style, but to the ultimate purchasers the word had reference to the plaintiff's own make. The court enjoined the defendant from marking his shirts with "Eureka," or so marking

the boxes containing them, since in that way the ultimate purchasers would be deceived. But in dealing with the traders, the retail stores, the defendant was left free to refer to the shirts as "Eureka," for there could be no deception. Mellish, L. J., said: "Then what is the test by which a decision is to be arrived at whether a word which was originally a trade mark has become publici juris? I think the test must be, whether the use of it by other persons is still calculated to deceive the public, whether it may still have the effect of inducing the public to buy goods not made by the original owner of the trade mark as if they were his goods. If the mark has come to be so public and in such universal use that nobody can be deceived by the use of it, and can be induced from the use of it to believe that he is buying the goods of the original trader, * * * the right to the trade mark must be gone."

It is argued that trade-mark rights can only be lost by abandonment, which we think did not take place here. In Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 S.Ct. 7, 12, 45 L.Ed. 60, the predecessor of the plaintiff had bottled bitter water in Hungary and called it "Hunyadi Janos" (the name of a national hero). Other Hungarian bitter water was sold in the United States in competition with this under the name "Hunyadi" and it was found that the name became generic. While the court granted an injunction against the use of infringing bottles and labels, it held that the plaintiff had no exclusive right to the name Hunyadi which had become public property, sustaining the defense of laches because of twenty years use of the name Hunyadi by the defendant. Justice Brown remarked in the opinion that: "The evidence shows that these Hungarian bitter waters were largely known in this country as Hunyadi waters, and that in a certain sense Hunyadi had become a generic word for them. Of course, if it became such with the assent and acquiescence of Saxlehner, he could not thereafter assert his right to its exclusive use. But as this appropriation was made against his constant protest, and as he apparently made every effort in his power to put a stop to the use of it, it ought not to be charged up against his claim that the word had become generic." In the paragraph in which the foregoing dictum appears the court had been discussing the use of the word "Hunyadi" for deceptive purposes as had been alleged in the bill of complaint. Any suggestion in the words we have quoted to the effect that mere effort on the part of the owner to stop the infringement of his trade-mark by others would enable him to prevent a word from becoming generic or to prevent the use of it as a descriptive word if it became generic can have related only to the word in its trade-mark character when used deceptively upon goods and not when used in a mere descriptive sense. Any further implication would negative the whole theory of trade-mark law.

In the present case the word "cellophane" ordinarily signifies the cellulose product we have been discussing and nothing more, but to certain persons it is probable that it means the complainant's goods. The situation, therefore, somewhat resembles that in Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, Bayer Co. v. United Drug Co. (D.C.) 272 F. 505, and Ford v. Foster (1872) L.R. 7 Ch.App. 611, so often found in litigations involving infringement of trade-marks and unfair competition where the decree should adjust the somewhat conflicting rights of the parties. The defendant should be allowed to use the word cellophane unconditionally in dealing with those to whom it means no more than the product and should be able to fill orders for cellophane received from such persons either with Sylvania cellophane or any other cellophane. But as the complainant's use of the word "cellophane" has had a wide publicity, there may be some persons who desire Du-Pont cellophane. Accordingly, it seems to us in the interest of justice that, when filling orders for cellophane, the defendant should state that the product sold is Sylvania cellophane or the cellophane of whomsoever may be the maker, and need state nothing more. The defendant may likewise use the word cellophane in its advertisements provided it shall prefix the maker's name as a possessive.

The decree is modified so as to limit the injunction in accordance with the terms of this opinion and so as to limit the accounting to such sales as the complainant may prove that the defendant has made to persons who, having expected to get Du-Pont Cellophane, received that of the other manufacturers.

Decree modified as above without costs upon this appeal to either party.