**BLISSCRAFT OF HOLLYWOOD,**
Plaintiff-Appellant,

v.

**UNITED PLASTICS COMPANY,** Marmax Products Corp., and Morris Shapiro, doing business as Great Eastern Housewares Company, Defendant-Appellees.

**No. 362, Docket 26829.**

United States Court of Appeals
Second Circuit.

Argued May 2, 1961.

Decided Sept. 28, 1961.

Harry Cohen, New York City (Stanley I. Rosen, New York City, on the brief), for plaintiff-appellant.

Lorimer P. Brooks, New York City (Ward, Neal, Haselton, Orme & McElhannon, New York City, on the brief), for defendant-appellees.

Before LUMBARD, Chief Judge, MOORE, Circuit Judge, and STEEL, District Judge.*

STEEL, District Judge.

Since September 1954 plaintiff has been continuously engaged in the manufacture and sale of plastic pitchers covered by Design Patent 174,793. Plaintiff sold its pitchers with labels affixed carrying the words "Poly Pitcher," and also advertised the pitchers to the trade and public under that name. In May 1957 the defendant United Plastics Company began to manufacture and sell a pitcher having an appearance similar to plaintiff's, with labels affixed bearing the words "Poly Pitcher." In August 1957 upon complaint from the plaintiff, United discontinued its "Poly Pitcher" labels, but adopted another which plaintiff claims is similar in overall appearance to its own.

Plaintiff sued United and its jobbers and customers, Marmax Products Corp., and Morris Shapiro, doing business as Great Eastern Housewares Company, for patent infringement, trademark in-

* United States District Judge for the District of Delaware sitting by designation.

fringement and unfair competition, and prayed for an injunction and profits and damages. The district court dismissed the action, and plaintiff has appealed. Since it is undisputed that Marmax Products and Morris Shapiro sold pitchers manufactured by United and bearing United's labels, their position in the litigation is the same as that of United, and we shall discuss the case as if United were sole defendant.

### Patent Infringement (Count 1)

The district court, exercising jurisdiction under 28 U.S.C. § 1338(a), held that plaintiff's patent was invalid because the design was lacking in invention and because it was dictated by functional or mechanical requirements of which the so-called pleasing effect of the pitcher was but a by-product.

The essentials for the issuance of a design patent are stated in 35 U.S.C. § 171. The design must not only be new, original and ornamental, it must also be the result of invention.

Plaintiff's pitcher is made of polyethylene. Structurally it is cylindrical in shape, has circular horizontal ridges around the body at uniform intervals, and has a flangelike base. It has an H-shaped handle with finger indentations, a scalloped snap-on lid with an extended pouring spout, and a hinged cap attached to the lid which fits over the spout.

■ Reference to the prior art discloses that plaintiff's pitcher is a combination of features of containers which were well known before plaintiff's production was begun. Of course, the mere fact that a person has utilized in combination a number of elements which severally were well known will not defeat the patentability of the combination. Graff, Washbourne & Dunn v. Webster, 2 Cir., 1912, 195 F. 522, 523. But the utilization of old elements in combination must represent an exercise of inventive skill and creative talent beyond that of the ordinary designer chargeable with knowledge of the prior art. International Silver Co. v. Pomerantz, 2 Cir., 1959, 271 F.2d 69, 71; Gen-

eral Time Instruments Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853, 854, certiorari denied 1948, 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770. What plaintiff did amounted to nothing more than an unstartling regrouping of old elements which demonstrated no originality born of inventive faculty. This is not enough. Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 1950, 184 F.2d 652, 655. It is not sufficient that plaintiff has shown the talent of an adapter; a manifestation of the art of the inventor was required. Blisscraft v. Rona Plastic Corp., D.C.S.D.N.Y.1954, 123 F.Supp. 552, affirmed 2 Cir., 1955, 219 F.2d 238. We agree with the district court that plaintiff's pitcher is lacking in the indispensable inventive ingredient. Plaintiff's commercial success in marketing its pitcher does not, without invention, make for patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162; Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 357, 59 S.Ct. 897, 83 L.Ed. 1334.

■ Plaintiff's patent was invalid for another reason. To be patentable, a design, in addition to being new and inventive, must be ornamental. This means that it must be the product of aesthetic skill and artistic conception. Burgess Vibrocrafters, Inc. v. Atkins Industries, 7 Cir., 1953, 204 F.2d 311. Plaintiff's pitcher has no particularly aesthetic appeal in line, form, color, or otherwise. It contained no dominant artistic motif either in detail or in its overall conception. Its lid, body, handle and base retain merely their individual characteristics when used in conjunction with each other without producing any combined artistic effect. The reaction which the pitcher inspires is simply that of the usual, useful and not unattractive piece of kitchenware. The design fails to meet the ornamental prerequisite of the statute.

While the issuance of the patent entitles it to a presumption of validity, this presumption is rebuttable. Here it

must yield to the evidence of lack of invention and lack of ornamentation. The view which we take of the matter makes it unnecessary for us to consider whether the utilitarian or mechanical features of the pitcher were so dominant in the design conception as to prevent patentability. The issue of infringement is, of course, moot.

### Unfair Competition (Count 2)

This count charges defendant with unfair competition in selling plastic pitchers which copy the form and configuration of the pitchers manufactured by similar to the labels used by plaintiff. plaintiff, and in affixing labels deceptively The complaint alleges that as a result of the sale, advertisement and promotion by plaintiff, the appearance of its pitchers and labels acquired in the trade and with the purchasing public a secondary meaning which identified all pitchers having such form and configuration and bearing such labels as pitchers of plaintiff's exclusive manufacture. It is alleged that defendant's action was taken with the intent and purpose of appropriating for itself the good will which plaintiff had established for itself and its pitchers, that such action is likely to cause confusion between pitchers manufactured by plaintiff and those manufactured by defendant, and to permit defendant and its dealers and retailers to substitute and palm off its pitchers as and for the genuine "Poly Pitcher" of plaintiff. The district court held that plaintiff was entitled to no relief under this count.[1]

▉ Preliminarily, a word should be said about the law to be applied. Jurisdiction of the district court of the Count 2 claim was asserted under 28 U.S.C. § 1332 upon the basis of diversity of citizenship, and under 28 U.S.C. § 1338(b) upon the ground that an unfair competition claim was joined with a substantial and related claim under the patent or trademark laws. The unfair competition claims which were asserted have their source in state law and would appear to require the application of state law, even though Count 1 alleges a claim of patent infringement based upon federal law. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 1956, 234 F.2d 538, 540–541, note 1. Although the complaint alleges that the wrongs of defendant occurred in the State of New York and elsewhere throughout the United States, there is no evidence where its sales were made apart from what possibly may be implied from the fact that plaintiff had a place of business in Hollywood, California and defendant in Fitchburg, Massachusetts. Neither the district court nor the parties have raised any question about whether federal or state law should be applied or have asserted that the law of one state as against that of another is controlling or would make any difference. Under the circumstances, we think that we are warranted in relying upon the "indeterminate general law." Maternally Yours, Inc. v. Your Maternity Shop, Inc., supra, at page 540, note 1; American Safety Table Co. v. Schreiber, 2 Cir., 1959, 269 F.2d 255, 271, certiorari denied 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185.

▉ The district court held that plaintiff had failed to establish that the appearance of its pitcher had acquired a secondary meaning. To establish a secondary meaning for an article it must be shown that the design is a mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source. Lucien Lelong v. Lander Co., 2 Cir., 1947, 164 F.2d 395, 397. Plaintiff's proof fails to meet this test. The letters written by customers to plaintiff contained in Exhibits V-1, 2 and 3 do not establish a secondary meaning for the appearance of the pitchers. The letters, for the most part, are simply orders of caps and spouts to replace those which had been lost, or reorders of the pitchers themselves. Since plaintiff's name, as the manufacturer, appeared upon the labels, this identified

---

1. The district court inadvertently referred to the claim under Count 2 as the "third cause of action." [189 F.Supp. 338.]

plaintiff as the manufacturing source and reasonably explains why the letters were sent to the plaintiff.

■ Despite the fact that plaintiff's pitchers have not acquired a secondary meaning, relief might still be granted if plaintiff had established either (1) palming off by defendant, (2) actual deception of purchasers, or (3) a violation by defendant of plaintiff's property rights. Norwich Pharmacal Co. v. Sterling Drug, Inc., 2 Cir., 1959, 271 F.2d 569, 571, certiorari denied 1960, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739. Here, the record fails to disclose any evidence of palming off or actual deception. Nor has it been shown that defendant violated any of plaintiff's property rights in the presently recognized unfair competition sense of interference with confidential or contractual relations. Norwich Pharmacal Co. v. Sterling Drug, Inc., supra, 271 F.2d at page 572, note 6. A comparison of the labels used by plaintiff and defendant on their pitchers since August 1957 discloses no such visual similarity as to give rise to any danger of confusion, palming off or substitution. It follows that neither the manufacture and sale by defendant of pitchers bearing a close resemblance to those manufactured and sold by plaintiff, or the use by defendant of the labels adopted in September 1957, constituted unfair competition, and defendant has been guilty of no unfair competition since that date.

### Trademark Infringement and Unfair Competition (Count 3)

The third count charges infringement by defendants of plaintiff's common law (unregistered) trademark "Poly Pitcher" and unfair competition based upon the use by defendants of labels bearing those words which, in their overall appearance, are asserted to be deceptively similar to plaintiff's labels. The critical facts are not disputed.

Since September 1954 plaintiff has been manufacturing and selling polyethylene pitchers with labels affixed carrying the words "Poly Pitcher" in large letters. A statement that plaintiff is the manufacturer appears in small print. In May 1957 United began to market its polyethylene pitchers, in form substantially like plaintiff's, with a label bearing the words "Poly Pitcher" in large letters and its own name in small print. United's label also contained its trademark, "Ster-lite," but the prominence of this was played down in comparison with the emphasis given to "Poly Pitcher." Other features of defendant's labels made them visually similar to plaintiff's label.

■ The district court held, quite correctly, that words which are merely descriptive of the qualities, ingredients or composition of an article cannot be appropriated as a trademark and are not entitled to protection unless they have acquired a secondary meaning. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 335–336, 59 S.Ct. 191, 83 L.Ed. 195. It found that "poly" was widely used in trade and general publications as synonymous with polyethylene, that in numerous advertisements of its pitchers and other articles of houseware plaintiff used "poly" in a descriptive sense as denoting that they were manufactured of unbreakable polyethylene, and that plaintiff had failed to prove that the words "Poly Pitcher" had acquired a secondary meaning. Upon the basis of these findings the court denied plaintiff relief, presumably—although it did not say so expressly—because it concluded that "Poly Pitcher" was descriptive of a pitcher which was made of polyethylene.

The findings which underlay the decision were either based on documentary evidence or oral evidence which is undisputed. Accepting this evidence at face value we are satisfied that the finding of descriptiveness based thereon was clearly erroneous.

We lay aside at the outset the fact that both before and after plaintiff began to use "Poly Pitcher," the word "poly" was understood in the trade and used in trade magazines as an abbreviation for polyethylene. The trade encompassed retail outlets, department stores, and large supermarket chains, through which

plaintiff marketed its wares. Members of this group were but intermediaries in the distribution of the pitchers to the ultimate buyer. The success or failure of plaintiff's business depended upon whether the pitchers could be resold to the housewife and other members of the purchasing public. The labels which were on the pitchers when plaintiff initially sold them remained on the pitchers until their point of final sale. It is with reference to the ultimate purchaser that the trademark significance of "Poly Pitcher" must be determined.

In determining whether a claimed trademark is descriptive at the time of its adoption, its meaning to a nonpurchasing segment of the population is not important. The critical question is whether the mark is descriptive to the prospective purchasers of the article. 3 Callmann, Unfair Competition & Trademarks § 71.1 at 1058 (2d Ed. 1950). In Le Blume Import Co. v. Coty, 2 Cir., 1923, 293 F. 344, 358–359 the court held that a word, "L'Origan," which was not in general use and was unintelligible and nondescriptive to the general public which comprised the ultimate purchasers, could properly be regarded as arbitrary and fanciful and capable of trademark usage, even though to linguists or scientists the name might have a descriptive connotation. In Pennsylvania Salt Mfg. Co. v. Myers, C.C.E.D.Mo.1897, 79 F. 87, appeal dismissed 8 Cir., 1897, 82 F. 1003, in dealing with the word "Saponifier," which had been claimed as a technical trademark for lye, the court said that to a student familiar with Latin and etymology the word might suggest an article having something to do with soapmaking; but it added, to "the uneducated part of the community [which] generally deal[s] in this article * * * the word * * * would probably have no special etymological signification [but] * * * would be considered as a fanciful or arbitrary term, and in no sense descriptive of the quality, characteristics, or ingredients of the article" (79 F. at page 90). The test of descriptiveness is "the meaning attached to the designation by prospective purchasers rather than the scientific meaning." Restatement, Torts § 721, comment c (1938).

So that in testing the initial validity of "Poly Pitcher" as a common law trademark the critical question is what the expression meant to the purchasing public. If it meant a pitcher made of polyethylene it could claim no validity as a trademark; but if its connotation was arbitrary or fanciful, it met the test of a valid trademark.

The record is devoid of any worthwhile evidence to show that at the time when plaintiff first began to use the "Poly Pitcher" labels the public generally understood "poly" to be synonymous with polyethylene or that "Poly Pitcher" meant a pitcher which was made of polyethylene.[2] Indeed, it would have been astonishing if it had any such understanding of terminology so essentially technical. We have been referred to no dictionary, general or scientific, which indicates that "poly" meant polyethylene. Webster's New International Dictionary (2d Ed. 1958) defines "poly" as "consisting of many," "a plurality," "a number above the normal." In the absence of any evidence to the contrary, we cannot assume that to members of the public at large the word "poly," either alone or in combination with "pitcher," had any meaning other than that attributed to it by the lexicographer. Unless a word gives some reasonably accurate—some tolerably distinct knowledge—as to what the product is made of, it is not descriptive within the meaning of trademark

2. United's dealer price lists which referred to "snack set in poly bag," etc., created no such public understanding.

Testimony on behalf of defendant disclosed that prior to plaintiff's first use of "Poly Pitcher" label, defendant had used "poly" to identify polyethylene and that it had used words like "poly cap," "poly snap cap," "poly salt shaker." Whether this was for internal purposes, or in dealing with the trade, or the public, is not shown. At best the evidence is inconclusive.

terminology. Keasbey v. Brooklyn Chemical Works, 1894, 142 N.Y. 467, 37 N.E. 476, 478. "Poly Pitcher," like the trademark which was sustained against the claim of descriptiveness in Selchow v. Baker, 1883, 93 N.Y. 59, 65, would not convey to a person who had never seen the pitcher, and who did not know what it was, any idea of its character, nor would it be an appropriate term to be used by a person desiring to describe it.

Moreover, "Poly Pitcher" is reminiscent or suggestive of Molly Pitcher of Revolutionary time. As used, it is an incongruous expression, and has the characteristics of a coined or fanciful mark. A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed to the goods and the goods are sold. Wallace & Co. v. Repetti, 2 Cir., 1920, 266 F. 307, 308, certiorari denied 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451;[3] 1 Nims, Unfair Competition & Trademarks § 218 at 633 (4th Ed. 1947); Restatement, Torts § 716, comment a (1938). Priority of user alone is controlling. See United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 100, 39 S.Ct. 48, 63 L.Ed. 141. The presumption that a fanciful word or mark becomes distinctive and identifies the source of goods on which it is used immediately after adoption and bona fide first use is basic in trademark law. 2 Nims, Unfair Competition & Trademarks § 346 at 1078 (4th Ed. 1947). At the time of its first adoption by plaintiff, "Poly Pitcher" had all of the essentials of a valid common law trademark.

In Re Crown Zellerbach Corp., 121 U.S. P.Q. 591 (Pat.Off.App.Bd.1959) does not compel a different conclusion. There, the Patent Office refused to register "Poly Paper" upon the ground that it was a descriptive name for the applicant's product. This was based upon evidence that the applicant had used "poly" interchangeably with polyethylene in connection with one form or another of wrapping paper, and that applicant's competitors had described polyethylene coated packaging and wrapping materials as "poly liners or bags" and the like. "Poly Paper" was proven to be descriptive to a large class of persons having to do with it. Where this is the case a mark cannot be registered under the statute even though there may be another class to whom the mark denotes origin. Vibroplex Co. v. J. H. Bunnell & Co., 2 Cir., 1928, 23 F.2d 490. An understanding by the houseware trade that "Poly Pitcher" meant a pitcher made of polyethylene, would have defeated plaintiff's right to have the mark registered under the statute; but this would not deprive the mark of its common law validity in its relationship to the purchasing public, if, as we have found, to the public at large the mark was not descriptive but a coined or fanciful expression.

This brings us to the question whether "Poly Pitcher," although originally valid as a common law trademark, lost its trademark significance before the defendants first began to use the term in May 1957. In 3 Restatement, Torts § 735, comment a (1938), it is stated that although a designation in its original significance is arbitrary or fanciful in relation to the goods on which it is used, its value as a trademark will be lost if it later comes to be understood in the market as descriptive of the goods. This view of the law presents the case in the most favorable light from defendant's standpoint and we shall assume that it is the correct principle to be applied.[4]

3. This case dealt with a registered mark, but the principle applicable to common law mark is no different. See Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 8 Cir., 1926, 15 F.2d 920, 925.

4. The law of New York is less favorable to defendants. Selchow v. Baker, 1863, 93 N.Y. 59 holds that one who adopts an arbitrary or fanciful designation as a trademark is entitled to be protected in its use, notwithstanding that it has become so generally known that it has been adopted by the public as the ordinary appellation of the article. This expression of the law was recently quoted with approval in Artype, Inc. v. Zappulla, 2 Cir., 1956, 228 F.2d 695, 697–698. The

In attempting to determine what the buying public understood by "Poly Pitcher" when the defendants began to use the mark, the manner in which the plaintiff and others used the words in trade magazines must be disregarded, for they were not intended for, and presumably did not reach, the eyes of the ultimate purchaser. When this medium is eliminated, the only significant proof of public understanding is that to be inferred from plaintiff's advertisements in newspapers in general circulation.[5] Twice in November 1954 plaintiff ran advertisements in the Los Angeles Times and twice in the spring of 1955 in the Trenton News in which the words "Poly* Pitcher" were prominently featured. The advertisement contained the following explanation of the asterisk's significance: " *Made of unbreakable polyethylene." In the late summer and early fall of 1955 plaintiff ran a total of six advertisements in the Chicago Sun, Philadelphia Inquirer and the Trenton News which depicted articles described as "Poly Pitchers," "Poly Cutlery Trays," "Poly Mixing Bowls," "Poly Butter Dishes," and "Poly Ice Cube Trays," and indicated that was a part of plaintiff's general line of "Poly Ware (Made of Polyethylene)." The last of these advertisements appeared about a year and a half before the defendant began to use "Poly Pitcher" on its labels.

What the buying public understood "Poly Pitcher" to mean when defendant adopted the mark is a question of fact. Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505, 509; DuPont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75, 81, certiorari denied E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443; 1938, 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539. Yet defendant offered no evidence as to public understanding except the advertisements themselves. In our view it cannot be said as a matter of law that plaintiff's advertising techniques caused the public to understand that "Poly Pitcher" meant any plastic pitcher regardless of who the manufacturer might be. The content of the advertising could well have taught the public to understand that if a pitcher bore a "Poly Pitcher" label it was a polyethylene pitcher of plaintiff's manufacture. This likelihood is enhanced by the advertising value which inhered in the sale of the pitchers themselves.

During 1955 and 1956 plaintiff sold in excess of 1,500,000 pitchers with "Poly Pitcher" labels attached.[6] None of these labels so much as mentioned polyethylene. The advertising impact of the labeled pitchers was substantial. They were brought directly to the attention of the purchasing public and were a daily reminder of the source—rather

holding, however, is at variance with the philosophy expressed in DuPont Cellophane Co. v. Waxed Products Co., 2 Cir., 1936, 85 F.2d 75, certiorari denied E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443; 1938, 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539, although, admittedly, the latter involved unfair competition rather than trademark infringement as such. The doctrine of the Cellophane decision was incorporated in Restatement, Torts, § 735 (1938). 2 Nims, Unfair Competition & Trademarks, § 417a at 1313 (4th Ed. 1947).

5. The only other evidence which even remotely bears upon the point is the Wall Street Journal article of March 5, 1957. This discusses various usages of poly-

ethylene. It refers to "high density poly," "linear poly," "rigid poly," "low pressure poly," "poly merchandisers" and the like. This article is of doubtful value in proving what buyers of plastic kitchenware generally understand "Poly Pitcher" to mean.

6. In 1957 plaintiff sold approximately 1,-200,000 pitchers carrying the "Poly Pitcher" label. The record fails to provide a basis for estimating the number sold before May 1957 when defendant began to use the "Poly Pitcher" label.

In 1954 plaintiff sold over 45,000 pitchers of the type on which, beginning in September 1954, it affixed "Poly Pitcher" labels. The record provides no basis for estimating how many were sold in 1954 after September.

than composition—significance of "Poly Pitcher." When the force of the label on the consciousness of the buying public is considered in conjunction with plaintiff's newspaper advertising, it cannot be held that the inevitable result of the latter was to destroy "Poly Pitcher" as an emblem of origin. At most, the composite impact of the labels and the newspaper advertising was to make the mark suggestive, i. e., to give it a significance somewhere in the middle ground between fanciful and descriptive. A designation having a suggestive connotation may nevertheless be a valid trademark. Douglas Laboratories Corp. v. Copper Tan, Inc., 2 Cir., 1954, 210 F.2d 453, certiorari denied 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109; Telechron, Inc. v. Telicon Corp., 3 Cir., 1952, 198 F.2d 903, 906; 3 Callmann, Unfair Competition & Trademarks § 71.2 at 1087 (2d Ed. 1950); 3 Restatement, Torts § 721, comment a (1938).

Defendant's adoption of "Poly Pitcher" was not induced by a desire to describe its pitcher in terms of its composition. The terms "Plastic Pitcher" or "Polyethylene Pitcher" would have been more meaningful. The number of the public who understood "poly" to be synonymous with polyethylene must, to defendant's knowledge, have been inconsequential. What defendant attempted to do was to share in the good will which the plaintiff had built up for itself through the use of the "Poly Pitcher" designation. This conclusion is fortified by the close visual resemblance in color, scheme and design which the label chosen by defendant bears to that which the plaintiff had been using for the preceding three years. Defendant's choice cannot be deemed to have been coincidence. Taking all these factors together, it is clear that the defendant's purpose was to cause prospective purchasers to mistake its own label for that of the plaintiff, and so enhance its own sales.

The use by defendant of a label bearing the term "Poly Pitcher" constituted an infringement of plaintiff's trademark. Its use on a label which simulated by color and arrangement plaintiff's label constituted unfair competition.

It is unfortunate that it has been necessary to so belabor this aspect of the appeal. On July 15, 1957 plaintiff wrote defendant asserting, among other things, that the latter was infringing its trademark "Poly Pitcher" and was competing unfairly by the use of a label which simulated plaintiff's. Defendant discontinued the use of the labels in August 1957 and has not used them since. On September 9, 1957 defendant wrote plaintiff and advised plaintiff that it (defendant) had discontinued the use of the name "Poly Pitcher." This was five months before plaintiff began its action. In its answer, however, defendant has denied the validity of "Poly Pitcher" as a trademark.

Under comparable circumstances it has been held that an injunction should issue against future usage. Wesson v. Galef, D.C.S.D.N.Y.1922, 286 F. 621, 626; Pinaud, Inc. v. Huebschman, D.C.E.D.N.Y.1928, 27 F.2d 531, 537, affirmed 2 Cir., 27 F.2d 538, certiorari denied 278 U.S. 644, 49 S.Ct. 80, 73 L.Ed. 558; Saxlehner v. Eisner, 2 Cir., 147 F. 189, 191, certiorari denied 1906, 203 U.S. 591, 27 S.Ct. 778, 51 L.Ed. 331. Furthermore, plaintiff is entitled to an accounting from defendants for the period May to August 1957 during which defendants were infringing plaintiff's trademark and competing unfairly with it.

Under the facts disclosed by the present record, no basis exists for the allowance of attorneys' fees to any of the parties.

The judgment of the district court dismissing Counts 1 and 2 is affirmed as to all defendants. The judgment as to Count 3 is reversed as to all defendants for the entry of a judgment consistent with this opinion.