NATIONAL AUTOMOBILE CLUB, a
corporation, Plaintiff,

v.

NATIONAL AUTO CLUB, INC., a
corporation, Defendant.

No. 70 Civ. 1741.

United States District Court,
S. D. New York.

Oct. 30, 1973.

880

Blum, Moscovitz, Friedman & Kaplan, New York City, for plaintiff; Alex Friedman, New York City and William B. Mackay, San Francisco, Cal., of counsel.

Frank Weg, and Robert M. Brandes, New York City, for defendant.

ROBERT L. CARTER, District Judge.

## OPINION

Plaintiff, a California corporation, brings this action against defendant, a New York corporation, for service mark infringement and unfair competition.[1] The court has jurisdiction

---

1. Trademark infringement is a form of unfair competition. American Auto Association v. Spiegal, 205 F.2d 771, 774 (2d Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953). Both claims will be dealt with jointly, insofar as it is recognized that the principles governing trademark infringement and unfair competition are essentially the same. Avon Shoe Co., Inc. v. David Crystal, Inc., 279 F.2d 607, 614 (2d Cir. 1960); Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 544, 545 (2d Cir. 1956).

pursuant to 15 U.S.C. § 1121 and 28 U. S.C. § 1338(a) and (b).

### Basic Factual Considerations:

Plaintiff's action is concerned with the infringing use of its service mark consisting of its name, National Automobile Club, in association with an eagle and shield design. Plaintiff has been in business since 1924, its service mark was registered in the United States Patent Office on May 24, 1955, the date of first usage of said mark was March 31, 1924. Plaintiff's members are almost exclusively California residents and motor vehicle owners and the few out-of-state members it does have are persons who first became members as California residents, but who may have subsequently moved out of the State. Apparently, such persons are maintained on the membership rolls until the expiration date of their current memberships. If they remain out of the state after their membership has expired, it is not renewed. In essence, all of plaintiff's active members are California residents.

Plaintiff obtains its members through insurance brokers. For an annual membership fee of twenty-two ($22.00) dollars, plaintiff disseminates among its members travel information, hotel and motel ratings, recovers stolen automobiles, provides legal services, pays traffic violations, and obtains motor vehicle license plates and title certificates. Some of the services it provides its members, such as, emergency road services, handling or assisting in travel arrangements or accommodations, and traffic citations, are available on a national scale. In addition, plaintiff arranges with various touring services throughout the country to provide help and assistance to its members when they visit the city or town in which the touring service is located. Plaintiff has 253,000 members, a gross annual income of $7,000,000 and during the period 1962–1972 plaintiff spent in excess of three million ($3,000,000) dollars in publicizing and advertising its name, including the publication of a magazine called

*"The National Motorist"* and placing advertisements in publications with nationwide circulation, such as *Forbes, Barrons* and *The Wall Street Journal.*

Defendant, on the other hand, is a recent entrant into the motor club field. Defendant's President and one hundred percent stockholder is himself an insurance broker and sells memberships in his organization to his clients. There are about 2,000 members and defendant has been in operation since November 19, 1968, when it was incorporated under the laws of New York. Its first use of the alleged infringing mark, National Auto Club in association with an eagle and shield design, occurred at that time, and in November, 1968 defendant heard of plaintiff's organization for the first time. Defendant's members are New York residents.

### Application of Governing Legal Principles:

Section 1114 of Title 15 of the United States Code provides the basic statutory remedy for trademark infringement and for unfair competition in the use of any registered mark. Its relevant language imposes civil liability upon

"(1) Any person who shall, without the consent of the registrant

(a) use in commerce any reproduction . . . or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided."

The essence of liability for trademark infringement is a similarity likely to cause confusion or deception of the consuming public. (Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F. 2d 495, 497 (2d Cir. 1962); Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 542 (2d Cir. 1956)). The interests of the prior mark owner which are

threatened by confusion of the public and deserving of protection are threefold: (1) protection against diversion of patronage, (2) protection of goodwill and customer favor, and (3) protection of legitimate potential to expand to other markets. *Federal Telephone & Radio Corp. v. Federal Television Corp.,* 180 F.2d 250, 251 (2d Cir. 1950); *S. C. Johnson & Son, Inc. v. Johnson,* 116 F. 2d 427, 429 and 175 F.2d 176, 180 (2d Cir. 1940, 1949).

■ While registration of a mark creates a presumption of its validity and is evidence of the exclusive right to its use, 15 U.S.C. § 1115(a), (b), *Flexitized, Inc. v. National Flexitized Corp.,* 335 F. 2d 774, 779 (2d Cir. 1964), it does not assure its protection in an infringement action.

" . . . a finding on infringement is by necessity a subjective determination by the trial judge based on his visceral reactions as to the likelihood of confusion the allegedly infringing mark will create in the minds of the public." *Societe Anonyme v. Julius Wile Sons & Co.,* 161 F.Supp. 545, 547 (S.D.N.Y.1958).

■ The Second Circuit, as well as other courts, has recognized in numerous decisions that a second comer has a duty to so name and package his product or service as to avoid all likelihood of consumers confusing it with the product or service of the first comer. *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc.,* 281 F.2d 755, 758 (2d Cir. 1960). But these holdings are only helpful insofar as they show a general pattern, since ultimately each case must be judged on its own facts. *Id.,* at 757; *see also, La Touraine Coffee Co., Inc., v. Lorraine Coffee Co., Inc.,* 157 F.2d 115, 117 (2d Cir.), cert. denied, 329 U.S. 771, 67 S. Ct. 189, 91 L.Ed. 663 (1946).

■ A set of criteria, useful in determining whether consumer confusion is probable, has evolved from the case law in this field. Among those factors which are considered significant are:

the strength of the mark, the degree of similarity between the marks in appearance and suggestion, the proximity of the products and services, the area and manner of concurrent use, actual confusion, the degree of care likely to be exercised by purchasers, and the defendant's intent and good faith in adopting its own mark. *See,* Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 543 (2d Cir. 1956); Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4 (E.D.N.Y.1969); Societe Anonyme v. Julius Wile Sons & Co., 161 F.Supp. 545 (S.D.N.Y.1958). It should be kept in mind that:

" . . . no single factor may be taken as determinative and that all the pertinent factors must be considered." *Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196, 200 (2d Cir. 1962).

■ In the immediate case, the plaintiff and defendant are engaged in basically similar businesses and in assessing the similarity of the marks themselves, a judge must put himself in the approximate position of an ordinary purchaser. *See,* Vitarroz Corp. v. River Brand Rice Mills, Inc., 266 F.Supp. 981, 983–984 (S.D.N.Y.1967). The mark must be considered as an entire unit.

"The ordinary buyer does not stop to dissect the marks and analyze their component parts; if he is deceived it is attributable to the mark as a totality and not normally to any particular part of it." *Societe Anonyme, supra,* at 547 of 161 F.Supp.

■ Simulation of a mark need not be identical in order to confuse. Points of general similarity rather than less important points of particular differences should be controlling because: "Confusion on the part of the careless or inattentive purchaser may not be disregarded." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc.,* 281 F.2d 755, 761 (2d Cir. 1960).

Bearing this in mind, it would be difficult not to conclude that the two marks are confusingly similar. There are some differences in detail in that the defendant's mark uses the word "auto", rather than "automobile", adds the words "service and protection", and has some additions and deletions in the pictorial part containing an eagle with spread wings. Yet, considering the mark as a totality, there is a strong probability that the average consumer would identify it with the mark of the plaintiff.

While the services and marks of the two parties are nearly identical, these are not the crucial factors in determining whether infringement has occurred. Despite the similarity of services and service marks, there are strong countervailing factors which would tend to mitigate the likelihood of consumer confusion and its resulting negative effect on the business interests of the plaintiff.

The mark of the plaintiff is an exceedingly weak one. See Matsushita Electric Industrial Co. v. National Steel Construction, 442 F.2d 1383 (CCPA 1971); The National Drying Machinery Co. v. Ackoff, 129 F.Supp. 389 (E.D.Pa. 1955), aff'd, 228 F.2d 349 (3rd Cir. 1955). The word "national" has been used many times to describe many types of products and services. "National" is a geographic term descriptive in nature since it pertains to a feature of the service, such as its purpose or function, and is not likely to be considered by the public a word of identification. See Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 498 (2d Cir. 1962). It is a word of our general vocabulary which all can use to describe products or services and should not be unduly limited. *Id.*

"It is axiomatic that a word or phrase which is primarily descriptive of the qualities, ingredients or characteristics of the article to which it is attached or to which it has reference cannot be claimed an exclusive trademark." 3 Callman, Unfair Competition, Trademarks, And Monopolies § 70.1 at 106 (3rd Ed. 1969).

The word "national" does describe the scope of the plaintiff's, as well as the defendant's, services and would seem to be an appropriate description for an automobile club. There is little to set it aside as distinctive.

Plaintiff asserts that it does not seek to protect the word "national" alone but in conjunction with its shield and eagle design. Such an assertion would be justified if the composite mark was "sufficiently distinctive to deserve judicial protection." National Van Lines v. Dean, 237 F.2d 688, 693 (9th Cir. 1956). In the *National Van Lines* case plaintiff sought an injunction against defendant National Transfer & Store Co. for use of its name in combination with a vertical stripe design. The word "national" in combination with a stripe design was found to be distinctive.

The exact designs in the prior case are not available to us, and, at any rate, as previously noted, prior cases are of little benefit in relation to such determinations. It should be noted, however, that in that case defendant had been an agent of the plaintiff, and there was a strong inference that he had consciously adopted the name and emblem of the plaintiff in order to confuse and deceive customers of the principal while acting as an agent; moreover, actual confusion did result.

In the immediate case, the particular emblem, combined with the words of the mark, is not clearly distinctive. It, as well as the verbal aspect of the mark, is a symbol in common usage. The eagle is a national symbol and the particular depiction of the eagle used by the defendant is copied from the presidential emblem. In this respect, it is somewhat "descriptive" in combination with the word "national" because it does symbolize the nation and thus relates to the particular characteristics of the service provided by the auto clubs.

The combination of the word "national" with a symbol of an eagle does not appear to me to be either arbitrary, fanciful or distinctive in relation to an automobile club providing national services. Somewhat on point is the case of Durable Toy & Novelty Corp. v. J. Chein & Co., 133 F.2d 853 (2d Cir.), cert. denied, 320 U.S. 211, 63 S.Ct. 1447, 87 L. Ed. 1849 (1943). In that case two toy banks were marketed under the name "Uncle Sam". No picture appears to have been involved, but in discussing the name, it was found that it was part of the national mythology similar to the flag and other patriotic paraphernalia, and thus all had a measurable interest in its use. It would seem that the eagle emblem is analogous, and especially in combination with the word "national" is not distinctive or arbitrary.

The court in the above case expressed the thought that if the plaintiff had wished a truly proprietary sign it would have contrived one which would have protected it without question. It concluded that the plaintiff

> ". . . cannot deprive others of the same commercial advantage which led it originally to adopt a legend so commonly employed." *Id.,* at 855.

As a weak and/or descriptive mark, plaintiff's mark might still be entitled to protection if it has acquired a secondary meaning. See Blisscraft of Hollywood v. United Plastics Co., 294 F. 2d 694, 698 (2d Cir. 1961); W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 661 (2d Cir. 1970). Secondary meaning develops where a word or mark has been used for so long and so exclusively by one enterprise, that the word or mark has come to mean to the public that the article or service is provided by that enterprise. In order to establish the existence of secondary meaning, a party seeking protection of its mark ". . . must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." Kellogg v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938).

When a term is descriptive, an inference of secondary meaning, properly supported, seems to be enough. *Bassett, supra,* at 661 of 435 F.2d. As to whether secondary meaning has been established, such factors as length and manner of use, nature and extent of advertising, and efforts made to promote a conscious connection in the public's mind between the name or mark and the particular product or venture are relevant. See Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 544 (2d Cir. 1956); 3 Callman § 77.3, at 349.

Ultimately, what determines whether a mark is merely descriptive or has achieved secondary meaning is the reaction of those to whom the trademark is directed. *Blisscraft, supra,* 294 F.2d at 699. In the immediate case there is scant evidence relating to actual consumer reaction to the mark of the plaintiff. While many cases which have found secondary meaning involved some evidence of consumer reaction based on polls or testimony, see, *e. g.,* Aloe Creme Laboratories, Inc. v. Milson, Inc., 423 F.2d 845, 850 (5th Cir. 1970); Anheuser-Busch, Inc. v. Bavarian Brewing Co., 264 F.2d 88, 91 (6th Cir. 1959), this would not appear to be absolutely necessary. An inference created from other factors has been found sufficient. See *Bassett, supra,* at 661 of 435 F.2d and *Maternally Yours, supra,* at 554 of 234 F.2d.

Plaintiff has used its mark since 1924 and has had it registered since 1955; it expended over $3 million in advertising and publicizing its name and insignia in the period between 1962 and 1972. An inference of likelihood of secondary meaning could thus be valid; but the pivotal question in this case is where has that meaning taken hold. If a particular segment of the population has come to identify the plaintiff's mark with the plaintiff as a source of the service it provides, then to determine the crucial question of confusion, we must identify that portion of the con-

suming public which is likely to be confused. Ultimately, it is the likelihood of confusion that will determine this case.

The evidence establishes that the plaintiff derives its membership exclusively from California residents, and that the gross income of the plaintiff is derived from that membership. While services are provided to its members traveling throughout the country, the bulk of its advertising appears to be concentrated in the State of California where members or potential members reside. Several exhibits demonstrate the existence of plaintiff's advertisements in various magazines and journals, some of which are national, but these appear to consist mostly of publications addressed to the insurance industry. Since membership in the plaintiff's, as well as the defendant's club, is derived mainly through the sale of insurance policies, this is a logical place to locate such advertisements. But, as conceded, only California insurance agents could sign up members for the plaintiff's club and only New York brokers could sign up members for the defendant's club. It is thus clear that the plaintiff's advertisements, while present in a national magazine, are directed solely to California brokers and would have little meaning to anyone else.

Other material of a national scope, related to the plaintiff, would appear to be its various travel pamphlets relating to different sections of the country. But these are prepared primarily for use by members who reside in California. While there are some people throughout the country who become aware of these publications, there is little evidence to indicate that as a result of constant exposure to advertising they have come to associate the mark of the plaintiff with the plaintiff as a source of information and service. Whatever confusion might arise on their part, if any, would not appear to be likely to have any effect on the business interests of the plaintiff.

It is plaintiff's contention that what is controlling is not the geographic concentration of its membership, but rather, the geographic area over which its services are provided. While the plaintiff might have some contact with travel services, hotels and motels throughout the country, the degree of involvement appears scant. Plaintiff's principal role is merely to establish the existence of these various services and accommodations so that its traveling members may avail themselves of them, if desired. In booking reservations for people, it would be quite clear who the parties were and their place of residence. No evidence is given of actual confusion in respect of this aspect of plaintiff's services. Indeed, it is difficult to conjure up a situation in which confusion would occur, or would be hurtful to the plaintiff. The members using the accommodation services surely know which auto club they belong to. Those providing the accommodation or services are concerned with meeting the needs of the individuals involved, and at best, if at all, only very tangentially with the identity of their automobile club.

As noted earlier, the interests to be protected from consumer confusion are diversion of patronage, protection of goodwill and customer favor, and potential to expand to other markets. Clearly, there can be no possible danger of diversion of patronage because plaintiff's and defendant's members are drawn from two distant geographical areas and these markets do not overlap. See Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959); Fairway Foods v. Fairway Markets, 227 F.2d 193, 196 (9th Cir. 1955). They are not in direct competition. This does not altogether dispose of the matter, however, since plaintiff has an interest in maintenance of its reputation and goodwill and this interest extends beyond California. Nonetheless, where, as here, there is no real possibility of confusion between the two services nor the likelihood that defendant could really capitalize on plaintiff's reputation or harm its prestige, then there can be no loss of goodwill.

Plaintiff cites Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948), as di-

rectly applicable to its claim. In that case, plaintiff was a world-famous restaurant and club, located in New York, which was constantly written up in national papers and well known to most people. Plaintiff had actively engaged in an extensive national advertising campaign. Its trade name and insignia were quite fanciful. The court there found that defendant's use of the identical name and insignia for a San Francisco restaurant infringed the plaintiff's trademark rights and constituted unfair competition. Even apart from the fact that plaintiff's reputation is not as widely known as the Stork Club, its national advertising nowhere approaches the level of the Stork Club, and its insignia is not fanciful. There is no possibility that the same people could make use of both parties' services and formulate an opinion on one based upon use of the other. The Stork Club drew its patronage from national and international circles; plaintiff's members are California and defendant's are New York residents.

There is some remote, but hard to conceive, possibility that defendant's involvement with various service agencies throughout the country, e. g. hotels or travel agencies, could affect the plaintiff's reputation, but involvement on this level appears to be minimal. There is a slim chance, however, that the two services would not be distinguished, but it is difficult to envisage how harm could be done. See Fairway Foods v. Fairway Markets, 227 F.2d 193 (9th Cir. 1955).

In terms of the right of expansion, there is no evidence of the likelihood that plaintiff intends to expand the area of actual membership to that of the defendant. While both parties are now providing services in the same national market, there does not seem to be the likelihood of confusion in that market with resulting harm to the plaintiff's business interests arising out of infringement of its service mark.

Finally, while it is established that defendant's president was general agent for a California-based insurance company, there was no evidence of any conscious imitation of plaintiff's mark or lack of good faith in adopting the mark in question. See Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196, 199 (2d Cir. 1962); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758–760 (2d Cir. 1960); Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4, 14 (E.D.N.Y.1969); Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F.Supp. 382, 389 (S.D.N.Y.1966). Nor can it be inferred from the association with a California-based insurance company, that defendant consciously and deliberately set out to imitate and copy plaintiff's mark or to deceive the public. It had operated several other companies under the name "national" and in this instance seems to be merely continuing that policy.

*Conclusion:*

■ Plaintiff's mark is an exceedingly weak one, descriptive in nature. If it has achieved secondary meaning, it would exist only within the State of California. Confusion arising among California consumers would be non-existent because the defendant only serves people living in New York. While the services provided by both plaintiff and defendant are nationwide in scope, there is little likelihood of confusion arising among members of either club as to the provision of services. The likelihood of confusion among those providing services is remote, and it is difficult to see how defendant's use of its name and mark could harm plaintiff's business interests.

Accordingly, the complaint is dismissed.

The foregoing constitutes the court's findings of fact and conclusions of law.

So ordered.